[No. 59442-2. En Banc. July 1, 1993.]

MICHAEL COLLIER, ET AL, *Respondents*, v. THE CITY OF TACOMA, *Appellant*.

---

*William J. Barker, City Attorney,* and *John C. Kouklis, Patricia Bosmans,* and *Heidi Ann Horst, Assistants,* for appellant.

*Adam Kline,* for respondents.

*Richard L. Andrews,* on behalf of the City of Bellevue and Washington State Association of Municipal Attorneys, amici curiae.

GUY, J. — Michael Collier, a candidate for Congress, posted his political campaign signs in residential areas within the city of Tacoma more than 60 days prior to the 1990 primary election. City workers removed Collier's signs from residential yards and parking strips in accordance with two Tacoma ordinances that restrict the preelection posting of political

signs in such areas to a 60-day campaign window. Collier sued Tacoma claiming the ordinances violated his free speech rights. The trial court entered judgment in favor of Collier, holding the ordinances unconstitutional. We accepted certification from the Court of Appeals and affirm in part and reverse in part.

## FACTS

Michael Collier was a candidate for the Democratic Party's nomination for Congress in the Sixth Congressional District of Washington in 1990. Collier had not previously held or run for any elective office. He was not considered a public figure or well known in political circles. Collier's opponent in the primary election was Representative Norm Dicks, a 14-year incumbent.

The primary election was scheduled for September 18, 1990. Collier began to plan his campaign in December 1989 and began fundraising in February 1990. Collier identified that the greatest obstacles to his campaign were lack of name familiarity and funding. During the course of the primary campaign, Collier raised and spent a total of $29,000. Representative Dicks spent $329,000 in his primary campaign.

Given his resources, Collier determined that yard signs were the most cost-effective means of communicating his political message. At the beginning of May 1990, the Collier campaign assembled some 700 2-sided yard signs. The first of these was posted outdoors between May 20 and 30. Collier supporters placed "Mike Collier for Congress" signs in their front yards and parking strips.

Tacoma Municipal Code (TMC) 2.05.275 defines and regulates political signs. The ordinance defines political signs as "[a]ll signs which are displayed out-of-doors on real property relating to the nomination or election of any individual for a public political office or advocating any measure to be voted on at any special or general election". The ordinance limits the posting of such political signs to a period of not more

than 60 days prior to and 7 days after the date of the election for which the signs are intended. TMC 2.05.275(1).[1]

Tacoma Municipal Code 6.03.070 prohibits any person, firm, or corporation from posting any signs

> on any public street or highway or upon any curbstone, lamp post, street sign, pole, hydrant, bridge, tree, or other thing situated upon any public street or highway or any publicly owned property within the City of Tacoma, except as may be authorized by ordinances of the City of Tacoma . . . PROVIDED, HOWEVER, the prohibition contained herein shall not apply to political signs placed on parking strips preceding a primary or general election where such political signs are installed pursuant to the permission of the owner of the property abutting said parking strip and installed in such a manner as not to constitute a traffic hazard . . ..

Real estate signs advertising the sale or rent of the property upon which they stand or to which they are attached, and other signs attached to any building or sidewalk advertising the business carried on in the building, are *exempt* from the provisions of this chapter. TMC 6.03.080.

Pursuant to these ordinances, Tacoma Public Works Department employees removed signs displaying "Mike Collier for Congress" from residential yards and parking strips within the city of Tacoma that were posted more than 60 days prior to the primary election. Mr. Benjamin Thompson, City Engineer for Tacoma, testified that he directed personnel from his department to pick up all signs in the public

---

[1] The full text of TMC 2.05.275(1) provides:

"(1) Such political signs shall not be displayed more than sixty days prior to and seven days after the date of the election for which intended. In cases where a general election follows within 55 days of a primary election, those signs for candidates whose names will appear on the ballot in the general election may be displayed during the interim period and up to seven days after the general election. In all instances herein in which political signs are required to be removed within seven days after the election for which the political sign was displayed, if said signs are not removed, they will be subject to removal by the City of Tacoma Public Works Department. Provided, however, that this provision shall not prohibit political signs in areas where other provisions of the Official Code of the City of Tacoma allows the same as legally licensed outdoor advertising displays."

right of way[2] throughout the city. Mr. Thompson testified that his department also removes commercial signs from residential areas since commercial signs are not permitted in those areas. Mr. Thompson understood that the ordinance allows an exception for on-site commercial signs pertaining to the sale or rent of private property. He testified that in order to enforce the ordinances, he differentiates between commercial and political signs by reading them.

Collier filed this action in July 1990 seeking a temporary restraining order, an injunction against the ordinances' enforcement, a declaratory judgment that the ordinances are unconstitutional, and attorney fees. The complaint was subsequently amended to include plaintiff[3] Joel Beritich, a Collier supporter who had political signs removed from his yard and parking strip. The amended complaint also cited 42 U.S.C. § 1983 as an additional source of protection for the rights involved and 42 U.S.C. § 1988 as the statutory basis for the claim of attorney fees. On February 15, 1991, the trial court entered judgment in favor of Collier, holding that the ordinances were unconstitutional, but denied Collier's claim for attorney fees. Tacoma appealed the trial court's judgment as to the ordinances, and Collier cross-appealed the trial court's denial of attorney fees. We accepted certification from the Court of Appeals and now affirm in part and reverse in part.

## ISSUES

This case presents three issues for review. First, do the Tacoma ordinances unconstitutionally restrict Collier's free speech rights? We hold that Tacoma's durational limitation

---

[2]Mr. Thompson defined public "right-of-way" as "that area within a development that is set aside for and dedicated for use of a public street, sidewalks, and public utilities." Report of Proceedings, at 11. Mr. Thompson testified that the public right of way extends 15 feet from the curb: 5 feet for the parking strip, 5 feet for the sidewalk, and an additional 5 feet into the homeowner's front yard.

[3]Hereafter, both plaintiffs are identified collectively as "Collier".

on the preelection posting of political signs unconstitutionally restricts Collier's right to political expression.

Second, did the trial court err in declaring the Tacoma ordinances unconstitutional in their entirety? We answer in the affirmative and hold unconstitutional only those portions of the Tacoma ordinances that impermissibly restrict political speech.

Third, did the trial court err when it denied plaintiffs' request for attorney fees pursuant to 42 U.S.C. § 1988? We reverse the trial court on the issue of attorney fees and remand for a determination of an award of fees consistent with this opinion.

ANALYSIS

I

■ The Tacoma ordinances are challenged under both the first and fourteenth amendments to the United States Constitution, and article 1, section 5 of the Washington Constitution. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech". U.S. Const. amend. 1. The freedom of speech which is secured by the First Amendment is "among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a State." *Burson v. Freeman*, ___ U.S. ___, 119 L. Ed. 2d 5, 12, 112 S. Ct. 1846 (1992) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 95, 84 L. Ed. 1093, 60 S. Ct. 736 (1940)). Article 1, section 5 of the Washington Constitution provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right."

■■ As we stated in *O'Day v. King Cy.*, 109 Wn.2d 796, 801-02, 749 P.2d 142 (1988) (citing *State v. Coe*, 101 Wn.2d 364, 373-74, 679 P.2d 353 (1984)), "[t]his court has a duty, where feasible, to resolve constitutional questions first under the provisions of our own state constitution before turning to federal law." We do so because in addition to our responsibility to interpret Washington's constitution, we must furnish a rational basis "for counsel to predict the future course of state decisional law." *State v. Gunwall*, 106 Wn.2d 54, 60,

720 P.2d 808, 76 A.L.R.4th 517 (1986). *See* Utter, *The Practice of Principled Decision-Making in State Constitutionalism: Washington's Experience*, 65 Temp. L. Rev. 1153 (1992). We recognize that the free speech clauses of the state and federal constitutions are different in wording and effect, but that the result reached by previous Washington cases in general adopted much of the federal methodology for application to state constitutional cases. The federal cases cited here and in our prior decisions are used for the purpose of guidance and do not themselves compel the result the court reaches under our state constitution. *See Michigan v. Long*, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983); *Seattle v. Mesiani*, 110 Wn.2d 454, 456, 755 P.2d 775 (1988). With these statements in mind, we turn to our analysis of the Tacoma ordinances.

## II

■ The Tacoma ordinances implicate several concerns in our free speech jurisprudence: regulation of political speech, regulation of political speech in a public forum, and regulation based on the content of the speech. The speech restricted by Tacoma Municipal Code sections 2.05.275 and 6.03.070 is political speech. The code defines "political signs" and restricts the time and place in which such signs may be posted. Wherever the extreme perimeters of protected speech may lie, it is clear the First Amendment protects political speech, *see Carey v. Brown*, 447 U.S. 455, 467, 65 L. Ed. 2d 263, 100 S. Ct. 2286 (1980), giving it greater protection over other forms of speech. *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 513, 69 L. Ed. 2d 800, 101 S. Ct. 2882 (1981). The constitutional protection afforded political speech has its "fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 28 L. Ed. 2d 35, 91 S. Ct. 621 (1971).

■ ■ The second important feature of the Tacoma ordinances is that they restrict political speech in a traditional public forum. The traditional public forum includes those places " 'which by long tradition or by government fiat have

been devoted to assembly and debate,' " such as parks, streets and sidewalks. *Burson v. Freeman, supra* at 13 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 74 L. Ed. 2d 794, 103 S. Ct. 948 (1983)); *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515, 83 L. Ed. 1423, 59 S. Ct. 954 (1939). *See also* Buchanan, *The Case of the Vanishing Public Forum*, 1991 U. Ill. L. Rev. 949, 951. The parking strips[4] in which Collier and his supporters placed his political signs lie between the "streets and sidewalks" and thus are part of the "traditional public forum". Because these places occupy a special position in terms of First Amendment protection, the government's ability to restrict expressive activity is very limited. *Boos v. Barry*, 485 U.S. 312, 318, 99 L. Ed. 2d 333, 108 S. Ct. 1157 (1988).

■ Since the Tacoma ordinances do not ban political signs altogether, we analyze the ordinances as time, place, and manner restrictions. *See, e.g., Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46, 89 L. Ed. 2d 29, 106 S. Ct. 925 (1986). The United States Supreme Court has held that even in a public forum, the government may impose reasonable restrictions on the time, place, and manner of protected speech, provided the restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 105 L. Ed. 2d 661, 109 S. Ct. 2746 (1989); *Perry Educ. Ass'n*, 460 U.S. at 45. We diverge from the Supreme Court on the state interest element of the time, place, and manner test, "as we believe restrictions on speech can be imposed consistent with Const. art. 1, § 5 only upon showing a compelling state interest."[5]

---

[4]Collier also raises an issue concerning the restriction of political speech on *private* property. This issue was not adequately addressed in the briefing, is not necessary to our decision in this case, and thus will not be discussed further.

[5]Our prior holdings have required counsel to discuss at least the factors enunciated in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986) when they assert the applicability of our state constitution. Counsel's failure in this case to discuss these factors would normally preclude our consideration of the state constitutional issues. *State v. Wethered*, 110 Wn.2d 466, 472, 755 P.2d 797

*Bering v. Share*, 106 Wn.2d 212, 234, 721 P.2d 918 (1986), *cert. dismissed*, 479 U.S. 1050 (1987). The broad language of Const. art. 1, § 5 as compared with the federal constitution compels this result.

Tacoma and amici curiae City of Bellevue and Washington State Association of Municipal Attorneys argue that the Tacoma ordinances are constitutionally permissible restric- tions on the time, place, and manner of political speech. We disagree. Applying the 3-part test for time, place, and manner regulations outlined above, we conclude that Tacoma's durational limitation on the preelection posting of political signs is unconstitutional. Our analysis of the Tacoma ordinances under each element of the time, place, and manner test follows.

## Content Neutrality

■ The trial court held that Tacoma Municipal Code sections 2.05.275 and 6.03.070 are "not content-neutral, in that they expressly define and regulate 'political' signs." Tacoma and amici argue that the ordinances are content-neutral because the City does not regulate the message conveyed — only the method by which it is conveyed. Collier claims the ordinances are content based because they define and regulate political speech as a class of expression. Constitutionally permissible time, place, or manner restrictions may not be based upon either the content or *subject matter* of speech. *See Consolidated Edison Co. of N.Y., Inc. v. Public Serv. Comm'n*, 447 U.S. 530, 536, 65 L. Ed. 2d 319, 100 S. Ct. 2326 (1980). Content-based restrictions on speech are pre-

---

(1988). Citation of *Bering v. Share*, 106 Wn.2d 212, 721 P.2d 918 (1986), *cert. dismissed*, 479 U.S. 1050 (1987) is not enough. Because *Bering* is a post-*Gunwall* case without *Gunwall* analysis, it might be construed not to call for such an analysis. For this reason, in this case only, we will not require a separate analysis of the nonexclusive factors in *Gunwall* to reach the state constitutional issue. For future cases, we stress that this court must have the benefit of a state constitutional argument that is of assistance to the court to determine the meaning of the language used as it relates to the state constitutional claim and whether there are factors other than language that should determine the scope of our constitutional provisions. *See* Utter, *The Practice of Principled Decision-Making in State Constitutionalism: Washington's Experience*, 65 Temp. L. Rev. 1153, 1160-63 (1992).

sumptively unconstitutional and are thus subject to strict scrutiny. *Renton*, at 46-47; *Burson v. Freeman*, 119 L. Ed. 2d at 13-14. Under that intense level of review, government must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Perry Educ. Ass'n*, 460 U.S. at 45.

The Tacoma ordinances do not fit neatly into either the content-based or the content-neutral category. Our review of the case law and commentary on this subject indicates that the distinction is not always transparent. *See, e.g.*, Stone, *Content Regulation and the First Amendment*, 25 Wm. & Mary L. Rev. 189 (1983-1984). In determining whether a restriction is content neutral or content based, the Supreme Court has held that "[g]overnment regulation of expressive activity is content neutral so long as it is *'justified* without reference to the content of the regulated speech.'" *Ward v. Rock Against Racism*, 491 U.S. at 791. While the Tacoma ordinances do not regulate political signs in terms of viewpoint, they describe and regulate permissible sign posting in terms of *subject matter*. Subject-matter restrictions are not directed at "particular ideas, viewpoints, or items of information, but at entire subjects of expression." Stone, 25 Wm. & Mary L. Rev. at 239. In this case, political signs are subject to a 60-day restriction "out-of-doors on real property", whereas on-site commercial signs identifying a property for sale or for rent are not. TMC 2.05.275; TMC 6.03-.070, .080. How long a sign may be maintained depends upon the kind of message the sign seeks to convey. The trial court found that Tacoma Public Works Department personnel have to read the signs in order to determine whether they are prohibited at a particular time.

The United States Supreme Court has held that an ordinance is content based if it distinguishes between permissible and impermissible signs at a particular location by reference to content. *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 516-17, 69 L. Ed. 2d 800, 101 S. Ct. 2882 (1981); *FCC v. League of Women Voters*, 468 U.S. 364, 383-84, 82 L. Ed. 2d 278, 104 S. Ct. 3106 (1984). As one commentator noted, the United States

Supreme Court's prohibition of content-based regulations is based "both on equal protection grounds and on a first amendment grant of equal access to an open forum." (Footnotes omitted.) Note, Members of the City Council v. Taxpayers for Vincent: *The Constitutionality of Prohibiting Temporary Sign Posting on Public Property to Advance Local Aesthetic Concerns*, 34 De Paul L. Rev. 197, 208-09 (1984-1985). The question is "not whether all those within the classes defined by the state are treated equally but, rather, whether the classification itself is permissible." Stone, *Fora Americana: Speech in Public Places*, 1974 Sup. Ct. Rev. 233, 276. As the Supreme Court stated in *Burson v. Freeman*, 119 L. Ed. 2d at 13 n.3, content-based restrictions raise Fourteenth Amendment equal protection concerns because such restrictions differentiate between types of speech. *See Metromedia*, 453 U.S. at 517-21 (billboard ordinance favoring commercial speech over noncommercial speech violated First Amendment neutrality); *Police Dep't v. Mosley*, 408 U.S. 92, 33 L. Ed. 2d 212, 92 S. Ct. 2286 (1972) (ordinance that prohibited picketing near a school building, but that expressly exempted peaceful labor picketing, held unconstitutional); *Matthews v. Needham*, 764 F.2d 58, 60 (1st Cir. 1985) (town bylaw that barred the posting of political signs on residential property but permitted the posting of certain commercial signs held facially unconstitutional because bylaw was concerned with content, as opposed to the time, place, or manner of the speech); *People v. Middlemark*, 100 Misc. 2d 760, 420 N.Y.S.2d 151 (Dist. Ct. 1979) (ordinance which proscribed political signs but allowed other signs in residential areas subjected to strict scrutiny); *Antioch v. Candidates' Outdoor Graphic Serv.*, 557 F. Supp. 52 (N.D. Cal. 1982) (municipal ordinance which imposed a 60-day limitation on political signs but not on commercial signs discriminated in the exercise of First Amendment rights in violation of the equal protection clause). The Tacoma ordinances, by regulating sign posting in terms of subject matter, albeit viewpoint neutral, fall within the realm of content-based restrictions.

Tacoma and amici argue that in determining content neutrality, the question is not whether the signs must be read, but whether the City of Tacoma prohibited the signs out of disapproval of the message promoted.[6] Citing *Ward*, Tacoma claims the principal inquiry in determining content neutrality in time, place, or manner cases is whether the government has adopted a regulation of speech "because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791 (citing *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 295, 82 L. Ed. 2d 221, 104 S. Ct. 3065 (1984)). Tacoma contends that since the ordinances serve a purpose unrelated to a sign's content, the ordinances are content neutral. *See Ward*, at 791.

Collier argues that this standard is too subjective, and that a showing of "improper legislative intent" would be practically impossible to make. We agree. The Supreme Court has recognized that "even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment." *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Rev.*, 460 U.S. 575, 592, 75 L. Ed. 2d 295, 103 S. Ct. 1365 (1983). In some cases, the fact that a regulation is content based and invalid will be apparent from its face. *See Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, ___ U.S. ___, 116 L. Ed. 2d 476, 492, 112 S. Ct. 501 (1991) (Kennedy, J., concurring). In other cases, a censorial justification "will not be apparent from the face of a regulation which draws distinctions based on content, and the government will tender a plausible justification unrelated to the suppression of speech or ideas." *Burson v. Freeman*, ___ U.S. ___, 119 L. Ed. 2d 5, 23, 112 S. Ct. 1846 (1992) (Kennedy, J., concurring). Although the Tacoma ordinances are viewpoint neutral, they define and regulate a specific subject matter — political speech.

---

[6]The stated purpose of Tacoma's sign code is "to provide minimum standards to safeguard life, health, property and public welfare by regulating and controlling the design, quality of materials, construction, location, electrification, and maintenance of all signs and sign structures." TMC 2.05.020.

This content-based distinction, while viewpoint neutral, is particularly problematic because it inevitably favors certain groups of candidates over others. The incumbent, for example, has already acquired name familiarity and therefore benefits greatly from Tacoma's restriction on political signs. The underfunded challenger, on the other hand, who relies on the inexpensive yard sign to get his message before the public is at a disadvantage. We conclude therefore that while aesthetic interests are legitimate goals, they require careful scrutiny when weighed against free speech interests because their subjective nature creates a high risk of impermissible speech restrictions. "[D]emocracy stands on a stronger footing when courts protect First Amendment interests against legislative intrusion, rather than deferring to merely rational legislative judgments in this area". *Metromedia*, 453 U.S. at 519.

Finally, Tacoma cites *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47, 89 L. Ed. 2d 29, 106 S. Ct. 925 (1986), for the proposition that an apparently content-based statute may be content neutral if the restriction on speech is targeted at the speech's *secondary effects*. In *Renton*, the Supreme Court considered the constitutionality of a zoning ordinance that restricted the location of adult theaters to one area of town. The ordinance was held constitutional because it did not target the content of the films shown at the theaters. Rather, the ordinance was aimed at the secondary effects that adult theaters have on the surrounding community. *Renton*, at 46. We do not find *Renton* dispositive since it did not analyze a content-based restriction on *political* speech. While a distinction between adult theaters and other kinds of theaters may be permissible based on a "secondary effects" analysis, drawing a similar distinction between commercial speech and political speech turns the favored status of political speech on its head. We therefore decline to draw such a distinction where a restriction on political speech in a public forum is at issue.

In summary, the Tacoma ordinances are viewpoint neutral, but are content based in that they classify permis-

sible speech in terms of subject matter. Ordinarily this conclusion would take the ordinances out of the domain of time, place, and manner restrictions, *Metromedia*, 453 U.S. at 516-17, and would instead require a strict scrutiny analysis. *Burson v. Freeman*, 119 L. Ed. 2d at 13-14. *See Perry Educ. Ass'n*, 460 U.S. at 45. We conclude, however, that the Tacoma ordinances can be reviewed under a time, place, and manner formulation. We hold that time, place, and manner restrictions on speech that are *viewpoint neutral*, but *subject-matter based*, are valid so long as they are narrowly tailored to serve a *compelling* state interest and leave open ample alternative channels of communication. This formulation of the standard of review comports with free speech jurisprudence under both article 1, section 5 of the Washington Constitution, *Bering v. Share*, 106 Wn.2d 212, 234, 721 P.2d 918 (1986), *cert. dismissed*, 479 U.S. 1050 (1987), and the first amendment to the United States Constitution. *See Burson v. Freeman*, 119 L. Ed. 2d at 23 (Kennedy, J., concurring) (recognizing that in time, place, and manner cases, since the regulation's justification is a "central inquiry", the compelling interest test may be one analytical device to detect, in an objective way, whether the asserted justification is in fact an accurate description of the purpose and effect of the law).[7] In this manner, we are able to balance the competing interests while recognizing that the burden of justifying a restriction on speech *remains on the State*. *See Burson*, at 32 (Stevens, J., dissenting).

### Compelling State Interest

Inasmuch as we have dealt with the first element of the time, place, and manner analysis, content neutrality, we next discuss the state interest element. Applying the standard enunciated above, Tacoma must prove that its

---

[7] For cases requiring careful judicial scrutiny of regulations to ensure that no covert content-based restrictions exist, *see Consolidated Edison Co. of N.Y., Inc. v. Public Serv. Comm'n*, 447 U.S. 530, 65 L. Ed. 2d 319, 100 S. Ct. 2326 (1980); *Erznoznik v. Jacksonville*, 422 U.S. 205, 45 L. Ed. 2d 125, 95 S. Ct. 2268 (1975). *See* Note, Members of the City Council v. Taxpayers for Vincent: *The Constitutionality of Prohibiting Temporary Sign Posting on Public Property To Advance Local Aesthetic Concerns*, 34 De Paul L. Rev. 197, 206 (1984-1985).

ordinances, taken together, are narrowly drawn to serve a compelling state interest. To constitute a compelling interest, the purpose must be a fundamental one and the legislation must bear a reasonable relation to the achievement of the purpose. *Adult Entertainment Ctr., Inc. v. Pierce Cy.*, 57 Wn. App. 435, 439, 788 P.2d 1102, *review denied*, 115 Wn.2d 1006 (1990). *See Bates v. Little Rock*, 361 U.S. 516, 524-25, 4 L. Ed. 2d 480, 80 S. Ct. 412 (1960). We determine the reasonableness of a time, place, and manner restriction by balancing the public interest advanced by the regulation against the extent of the restriction on free speech rights. *State v. Lotze*, 92 Wn.2d 52, 58, 593 P.2d 811, *appeal dismissed*, 444 U.S. 921 (1979); *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 502, 69 L. Ed. 2d 800, 101 S. Ct. 2882 (1981).

Tacoma argues that its interest in city aesthetics and traffic safety is a compelling state interest, and that the ordinances were "narrowly tailored" to serve that interest. We disagree. Although aesthetics has been determined to be a significant governmental interest, *Members of City Coun. v. Taxpayers for Vincent*, 466 U.S. 789, 805, 80 L. Ed. 2d 772, 104 S. Ct. 2118 (1984), it has not been determined to be an interest sufficiently compelling to justify restrictions on political speech in a public forum. The record in this case does not justify such a result. While Tacoma and amici cite *Vincent* and *State v. Lotze, supra,* for support, neither decision supports their premise that aesthetics and traffic safety are state interests sufficiently compelling to outweigh the restrictions imposed on Collier's free speech.

In *Vincent*, the Court upheld a municipal ordinance prohibiting the posting of any signs on public property. Roland Vincent was a candidate for election to the Los Angeles City Council. His political signs were attached to utility poles throughout the city. Pursuant to the ordinance, his signs were removed from the poles. The Court concluded that the ordinance was a valid time, place, and manner restriction. *Vincent*, at 815. *Vincent* is distinguishable from this case in two important respects. First, *Vincent* involved a law that prohibited the posting of all signs, regardless of content. Second,

the utility poles upon which Vincent's signs were posted were not considered part of the traditional public forum. *Vincent*, at 814. *See also* Note, Members of the City Council v. Taxpayers for Vincent: *The Constitutionality of Prohibiting Temporary Sign Posting on Public Property To Advance Local Aesthetic Concerns*, 34 De Paul L. Rev. 197, 227 (1984-1985) (analyzes *Vincent* as misapplying First Amendment precedent and the primacy of political speech).

In *State v. Lotze, supra*, we held that aesthetics and, to a greater extent, traffic safety were interests sufficiently compelling to outweigh the incidental restrictions on the appellants' exercise of First Amendment speech. *Lotze*, at 58-60. In *Lotze*, the State sought to remove political billboards adjacent to a highway under the authority of Washington's highway sign law (RCW 47.42), which generally prohibits all signs visible from interstate, primary or scenic systems except as permitted under the act. The listed exceptions under the act include signs advertising the sale or lease of property upon which they are located. We stated that unlike on-premise business signs and realty for sale signs, political messages such as the signs involved in *Lotze* are addressed "to the general universality of political ideas" and need not be linked with a specific site in order to derive meaning. *Lotze*, at 59. We held that the statute met the test for a state restraint on First Amendment rights because appellants' speech was not controlled as to content and because alternative means of communicating such views were available. *Lotze*, at 60.

The Supreme Court in *Metromedia*, 453 U.S. at 513 n.18, overruled its prior summary approval of *State v. Lotze*, 92 Wn.2d 52, 593 P.2d 811, *appeal dismissed*, 444 U.S. 921 (1979). Finding that San Diego's aesthetic interests were sufficiently significant to justify its ban on off-site commercial advertising, but were insufficient to warrant a ban on noncommercial signs, the Court observed that some decisions, including *State v. Lotze, supra*, have failed to give adequate weight to the distinction between commercial and noncommercial speech. *Metromedia*, 453 U.S. at 513 n.18. Other courts have also criticized the analysis in *Lotze*. In

*Van v. Travel Information Coun.*, 52 Or. App. 399, 628 P.2d 1217 (1981), the Oregon Court of Appeals held that a 60-day restriction on temporary political signs adjacent to highways was unconstitutional. The *Van* court relied on a majority of decisions which were contrary to *Lotze* in order to conclude that aesthetic interests were insufficient to justify the significant restriction on political speech imposed by the 60-day limitation on political campaign signs. *Van,* at 416.

We agree with Collier that *Lotze* should not be controlling on this issue. We depart from our holding in *Lotze* to the extent it implies that aesthetics and traffic safety are compelling interests justifying greater restrictions on political speech than on commercial speech. We recognize that Tacoma's ordinances, unlike the statute at issue in *Lotze,* do not completely prohibit political sign posting. Given the preferred status of political speech, however, Tacoma has failed to show that its interest in maintaining a clean, litter-free community[8] is sufficiently compelling to justify its disparate treatment of political speech. In *Metromedia,* San Diego's allowance of some billboards, but not others, was evidence that its interests in traffic safety and aesthetics, while "substantial", fell short of "compelling". *Metromedia,* 453 U.S. at 520. Likewise, Tacoma's disparate treatment of on-site commercial signs over political signs indicates that its interest in aesthetics is significant, but not compelling.

Furthermore, Tacoma has not shown that yard signs create a substantial traffic hazard. There was no evidence that any of Collier's signs were hazardous to traffic or blocked pedestrian access. Mr. Thompson knew of no yard signs that had been found blocking sidewalks, utility lines or poles, or streets. Tacoma's claim that it restricts political yard signs to a 60-day period on behalf of a "compelling state interest" in traffic safety lacks evidentiary support. Once political signs are allowed on a temporary basis, "it is difficult to imagine how prohibiting political signs at other times significantly promotes highway safety." *Van,* 52 Or. App. at 412.

---

[8]Indeed, Collier argues that the self-interest and good sense of candidates already serves to regulate political yard signs.

A regulation that serves a compelling state interest must be narrowly tailored to serve that interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 105 L. Ed. 2d 661, 109 S. Ct. 2746 (1989); *Bering v. Share*, 106 Wn.2d 212, 233-34, 721 P.2d 918 (1986), *cert. dismissed*, 479 U.S. 1050 (1987). The trial court found that neither ordinance is narrowly tailored to serve a compelling state interest. Tacoma argues that its restrictions are narrowly drawn since they allow political signs to be posted for the duration of a political campaign. We disagree.

The Tacoma ordinances restrict political expression by imposing durational limitations on the preelection posting of political campaign signs. Tacoma cites two cases for authority that preelection sign limitations have been upheld. Neither decision provides a satisfactory rationale for upholding such restrictions. In *Huntington v. Estate of Schwartz*, 63 Misc. 2d 836, 839, 313 N.Y.S.2d 918 (Dist. Ct. 1970), the court held that a 6-week limitation on political signs was within the scope of the municipality's police powers. The court found that the municipality could use or consider aesthetic considerations in applying such power. *Cf. People v. Middlemark*, 100 Misc. 2d 760, 763, 420 N.Y.S.2d 151 (Dist. Ct. 1979) (distinguished *Huntington*, holding that a similar political sign ordinance was unconstitutional because it made an impermissible distinction between political signs and other signs). In *Ross v. Goshi*, 351 F. Supp. 949, 955 (D. Hawaii 1972), the court upheld a 60-day restriction, stating only that the ordinance was a "proper balancing of the conflicting interests". We find these decisions unpersuasive since they lack a discussion of the First Amendment and equal protection considerations at issue.

Other courts have held that preelection durational limitations on political campaign signs are unconstitutional. In *Antioch v. Candidates' Outdoor Graphic Serv.*, 557 F. Supp. 52 (N.D. Cal. 1982), the court held that the Antioch municipal ordinance, which banned the posting of temporary political signs everywhere in the city for all but a 60-day period before an election, unconstitutionally discriminated in the

exercise of First Amendment rights in violation of the equal protection clause. The *Antioch* court viewed the ordinance as a general "ban" on political speech, with a temporary, 60-day suspension, prior to an election. *Antioch*, at 56. *See also Van v. Travel Information Coun.*, *supra* at 416 (60-day limitation unnecessarily restrictive in light of the First Amendment interests involved and the State's interests sought to be advanced); *Orazio v. North Hempstead*, 426 F. Supp. 1144 (E.D.N.Y. 1977) (ordinance which limited the posting of political wall signs to 6 weeks prior to an election was invalidated on equal protection grounds). *See generally* Blumoff, *After Metromedia: Sign Controls and the First Amendment*, 28 St. Louis U.L.J. 171, 194-96 (1984).

Tacoma's 60-day restriction, unlike the typical time, place, and manner restriction, does not attempt to determine whether and at what times the exercise of free speech rights is compatible or incompatible with the normal uses of a traditional forum or place. The Tacoma ordinances, like the ordinances in *Antioch*, *Van*, and *Orazio*, unnecessarily restrict the preelection posting of signs promoting the candidacy of certain individuals or advocating a certain viewpoint on an upcoming ballot proposition. Tacoma has not shown that its restrictive time period of 60 days, even if evenhandedly applied to all temporary signs, reasonably and adequately provides for the exercise of political speech. Before the City may impose durational limits or other restrictions on political speech to advance aesthetic interests, it must show that it is seriously and comprehensively addressing aesthetic concerns with respect to its environment. *Antioch*, 557 F. Supp. at 60. *Accord, Tauber v. Longmeadow*, 695 F. Supp. 1358, 1362 (D. Mass. 1988). *See also Metromedia, Inc. v. San Diego*, 453 U.S. 490, 528-31, 69 L. Ed. 2d 800, 101 S. Ct. 2882 (1981) (Brennan, J., concurring in judgment) (failure to provide adequate justification for a restriction on protected activity merits invalidation of the restriction). Tacoma has made no showing on the record that it is seriously and comprehensively addressing aesthetic or traffic safety concerns other than through the ordinances in question.

While Tacoma is correct that the ordinances are not invalid simply because there may be some "imaginable alternative that might be less burdensome on speech", *Ward*, 491 U.S. at 797 (quoting *United States v. Albertini*, 472 U.S. 675, 689, 86 L. Ed. 2d 536, 105 S. Ct. 2897 (1985)), the ordinances fail to provide adequately for Collier's free speech rights. Given the preferred status accorded political speech, and the persuasive authority in other jurisdictions which have dealt with this issue, we conclude the Tacoma ordinances are not narrowly drawn to serve a compelling state interest. In balancing the competing interests, we hold that Tacoma's regulatory interests in aesthetics and traffic safety, as demonstrated on the record, do not outweigh Collier's right to political speech. We depart from our decision in *Lotze* to the extent it conflicts with our decision in this case.

### Alternative Channels of Communication

The third and final element of both the federal and state constitutional tests requires that a time, place, and manner restriction leave open ample alternative channels for communication. *Ward*, 491 U.S. at 791; *Bering*, 106 Wn.2d at 234. The trial court found that Collier had not "sustained [his] burden of proof that the ordinances do not leave open . . . an alternative means of communication". Collier assigns error to the trial court's placement of the burden of proof on him. We agree with Collier.

Government may impose reasonable restrictions on the time, place, or manner of speech, provided the restrictions meet the standards enunciated above. Because Tacoma seeks to uphold the ordinances as reasonable time, place, and manner restrictions on political speech, it has the burden of meeting each element of the time, place, and manner test. We conclude the trial court erred in assigning Collier the burden of proving the "availability of alternative channels of communication", the third element of the time, place, and manner test. *See Bering*, 106 Wn.2d at 234; *Ward*, 491 U.S. at 791. That burden properly rests with Tacoma, and Tacoma has failed to meet it.

■ Both Tacoma and amici argue that politicians have numerous ways of expressing themselves through other media than the posting of signs. Collier does not dispute that he had the right to purchase radio and television time and to engage in direct mail. His argument is that these alternative modes of communication were effectively unavailable to him as an underfunded challenger. Based on our review of the record, we agree with Collier. In Collier's case, the yard sign was the most cost-effective, realistic method of increasing his name familiarity. Because means of political speech are not entirely fungible, the political yard sign offers special advantages to the candidate seeking public office. Political yard signs are relatively cost-effective and can be localized to a high degree. *Antioch*, 557 F. Supp. at 59 (citing *Baldwin v. Redwood City*, 540 F.2d 1360, 1368 (9th Cir. 1976), *cert. denied*, 431 U.S. 913 (1977)). In Collier's case, the issue is not whether "ample alternatives" are available, but whether they are *practically* available. Alternatives are not "alternatives" if they are far from satisfactory. *Metromedia*, 453 U.S. at 516. Thus, the "summary seizure of a political sign for even a few days can deprive the sign's owner of an important First Amendment liberty interest." *Baldwin*, 540 F.2d at 1374. Given the record before us, we conclude that Tacoma's restrictions on political sign posting did not afford Collier adequate alternative channels of communication.

In summary, we concur with the trial court that the Tacoma ordinances are invalid time, place, and manner restrictions. Tacoma has failed to prove that its interests in aesthetics and traffic safety are sufficiently compelling to justify the restrictions imposed on Collier's rights to political expression. Tacoma has also failed to prove that its restrictions left Collier ample alternative channels in which to communicate his message. We conclude, therefore, that Tacoma's durational limitation on the preelection posting of political campaign signs violates the free speech provisions of both the Washington and the United States Constitutions.

## III

Tacoma claims the trial court erred in declaring both ordinances unconstitutional in their entirety. We agree. The record indicates that the parties' dispute focused on section (1) of TMC 2.05.275, rather than on the ordinance as a whole. No issue was raised as to section (2) (size limitations), or section (3) (requiring consent of private property owners). Similarly, only those portions of TMC 6.03.070 and .080 that affect political expression are at issue.

As a general rule "only the part of an enactment that is constitutionally infirm will be invalidated, leaving the rest intact." *National Advertising Co. v. Orange*, 861 F.2d 246, 249 (9th Cir. 1988). *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 94 L. Ed. 2d 661, 107 S. Ct. 1476 (1987). We hold unconstitutional only those provisions of the ordinances which impermissibly restrict the scope of political speech through limitations on the time and place for the preelection posting of political signs. Tacoma's interests in aesthetics and traffic safety are sufficient to justify reasonable, content-neutral regulation of the *noncommunicative* aspects of political signs, such as size, spacing, and consent of the private property owner.

We are sensitive to the need for judicial restraint in intruding on the exercise of the police power by local governments to regulate land uses in the interest of public health, safety, and welfare. Consequently, our holding does not compel a change to postevent *removal* requirements as long as such requirements are reasonable and apply to all temporary events, such as political campaigns, home sales and residential renting. While preelection political speech interests may outweigh a municipality's regulatory interests in a given case, those same interests are not present postevent and may be outweighed by a municipality's demonstrated interests in aesthetics or traffic safety. *See Baldwin v. Redwood City, supra* (10-day postelection removal requirement upheld).

## IV

Collier assigns error to the trial court's holding that the "special circumstances" of trial publicity and representation by the ACLU preclude an award of attorney fees under 42 U.S.C. § 1988. Collier also requests additional fees for the purposes of this appeal.

A party prevailing in an action under 42 U.S.C. § 1983 may recover reasonable attorney fees pursuant to 42 U.S.C. § 1988. *Jacobsen v. Seattle*, 98 Wn.2d 668, 675, 658 P.2d 653 (1983). A prevailing plaintiff " 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.' " *Jacobsen*, at 675-76 (quoting *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402, 19 L. Ed. 2d 1263, 88 S. Ct. 964 (1968)).

In the instant case, the trial court ruled in favor of plaintiffs Collier and Beritich. They are "prevailing parties" for the purposes of the statute. The trial court, however, identified publicity gained by the suit and ACLU representation as "special circumstances" which warranted denial of an award of attorney fees. We disagree. In *Runyon v. Fasi*, 762 F. Supp. 280 (D. Hawaii 1991), the plaintiff requested attorney fees pursuant to 42 U.S.C. § 1988 in a factually similar action challenging the constitutionality of a city ordinance which prohibited outdoor political signs. The *Runyon* court addressed the identical issue of public service representation as a "special circumstance". We agree with the *Runyon* court's conclusion that the fact that the prevailing party was represented by a public service firm or association funded by public funds is irrelevant. *See Runyon*, 762 F. Supp. at 286 (citing *Watkins v. Mobile Housing Bd.*, 632 F.2d 565 (5th Cir. 1980)). As to the issue of trial publicity, Tacoma urges this court to accept the trial court's denial of attorney fees as a proper use of discretion. The trial court, however, made no finding that Collier used the judicial system to gain publicity for political purposes.

Tacoma argues that should this court reverse the trial court on the issue of attorney fees, the court should limit the amount of attorney fees to reflect work performed from the

point after which the complaint was amended. Tacoma reasons that until respondents filed the amended complaint which cited 42 U.S.C. § 1988 as statutory authority for attorney fees, Tacoma had no notice of any claim for attorney fees. We disagree. Tacoma had notice of respondents' claim for attorney fees with the filing of Collier's original complaint. Collier's amendment of his complaint to add an additional source of authority for obtaining attorney fees does not alter the fact that Tacoma had sufficient notice to prepare an adequate response to Collier's request for attorney fees.

The final issue to resolve is whether the requested fees were reasonable. The trial court found that the plaintiffs' attorney had spent 99.3 hours in the prosecution of this action, and "said hours have been expended reasonably and necessarily in view of the result obtained." The trial court also found that the plaintiffs' attorney's hourly rate of $150 was reasonable compensation for the work performed. These findings were uncontroverted. We will not disturb these findings on appeal.

## CONCLUSION

The Tacoma ordinances impermissibly restrict Collier's right to political expression in violation of article 1, section 5 of the Washington Constitution, and the first and fourteenth amendments to the United States Constitution. We hold unconstitutional those portions of the Tacoma ordinances that impose durational limitations on the preelection posting of political signs. We remand for a determination of a reasonable attorney fee, to include a determination of attorney fees on appeal.

UTTER, DOLLIVER, SMITH, and JOHNSON, JJ., concur.

DURHAM, J. (concurring) — For 15 years, this court has wrestled with the difficult concept of independent state constitutional analysis. The circumstances under which it should be applied has been the subject of many divided opinions and

considerable acrimony. Finally, in 1986, this court *unanimously* agreed on a list of six nonexclusive criteria to aid in determining when state constitutional analysis is appropriate. *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986). Shortly thereafter, in *State v. Wethered*, 110 Wn.2d 466, 472, 755 P.2d 797 (1988), we unequivocally stated the necessity of employing the *Gunwall* criteria:

> Wethered urges this court to follow our holding in *State v. Lavaris*, 99 Wn.2d 851, 664 P.2d 1234 (1983) under Const. art. 1, § 9 and cites *State v. Simpson*, 95 Wn.2d 170, 622 P.2d 1199 (1980) as general authority that the Washington Constitution can be and has been interpreted as more protective of individual rights than the United States Constitution. *He fails to use the Gunwall interpretive principles to assist this court . . .. By failing to discuss at a minimum the six criteria mentioned in Gunwall, he requests us to develop without benefit of argument or citation of authority the "adequate and independent state grounds" to support his assertions. See Michigan v. Long*, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983). *We decline to do so consistent with our policy not to consider matters neither timely nor sufficiently argued by the parties. In re Rosier*, 105 Wn.2d 606, 616, 717 P.2d 1353 (1986).

(Italics mine.)

Since *Gunwall* and *Wethered*, over 70 Washington appellate decisions have acknowledged our rule barring consideration of state constitutional issues absent briefing of the *Gunwall* factors. *E.g.*, *State v. Greenwood*, 120 Wn.2d 585, 614, 845 P.2d 971 (1993); *Tellevik v. 31641 West Rutherford St.*, 120 Wn.2d 68, 77, 838 P.2d 111, 845 P.2d 1325 (1992); *State v. Rodriguez*, 65 Wn. App. 409, 414 n.1, 828 P.2d 636, *review denied*, 119 Wn.2d 1019 (1992). In fact, one noteworthy commentator has explained that:

> Assistance from counsel in interpreting state constitutional provisions is *vitally important. Wethered* directs counsel to bring the constitutional issues into as sharp a focus as they possibly can by *requiring* them to fashion a state constitutional argument that addresses textual language, constitutional and common law history, structural differences, and local concerns. *Our decision in Wethered reaffirmed that the criteria are a necessary starting point for a discussion between bench and bar about the meaning of a state constitutional provision.*

(Italics mine.) Justice Robert F. Utter, *The Practice of Principled Decision-Making in State Constitutionalism: Washing-*

*ton's Experience*, 65 Temp. L. Rev. 1153, 1162 (1992). This same commentator has recognized that "*Gunwall* functions as a *procedural threshold* for considering state constitutional claims". (Italics mine.) Utter, at 1165.

Today, however, 8 years of painfully crafted jurisprudence is cast aside in a footnote: "[b]ecause *Bering* [*v. Share*, 106 Wn.2d 212, 721 P.2d 918 (1986)] is a post-*Gunwall* case without *Gunwall* analysis, it might be construed not to call for such an analysis. For this reason, in this case only, we will not require a separate analysis of the nonexclusive factors in *Gunwall* to reach the state constitutional issue." Majority, at 747-48 n.5. This reasoning completely ignores the *Wethered* rule, which was adopted 2 years after *Bering*. Moreover, putting aside the majority's attempt to limit its own case to the facts, there is no principled way to keep this exception from swallowing the rule. *Bering* was not unique. There were several cases between *Gunwall* and *Wethered* that engaged in a state constitutional exegesis without the benefit of the *Gunwall* factors. *See, e.g., Seattle v. Mesiani*, 110 Wn.2d 454, 755 P.2d 775 (1988) (interpreting Const. art. 1, § 7); *O'Day v. King Cy.*, 109 Wn.2d 796, 801-02, 749 P.2d 142 (1988) (interpreting Const. art. 1, § 5); *State v. Stroud*, 106 Wn.2d 144, 720 P.2d 436 (1986) (plurality opinion) (interpreting Const. art. 1, § 7). As such, the majority's analysis only serves to cast doubt on a wide body of law under Const. art. 1, §§ 5 and 7 requiring briefing of the *Gunwall* factors. If, indeed, it is the intention of a majority of this court to cast aside the *Gunwall/Wethered* principles, it should be done forthrightly and with reasoned analysis.[9]

Ironically, the majority's result in negating the Tacoma sign ordinance could be reached under federal law analysis. *See, e.g., Burson v. Freeman*, ___ U.S. ___, 119 L. Ed. 2d 5,

---

[9]It is so that "[t]his court has a duty, *where feasible*," to consider state constitutional analysis. (Italics mine.) Majority, at 745. However, the case cited in the lead opinion for this proposition, *O'Day*, 109 Wn.2d at 801-02 (citing *State v. Coe*, 101 Wn.2d 364, 373-74, 679 P.2d 353 (1984)), was decided prior to the *Wethered* rule. In fact, *Wethered* specifically recognized that this language from *O'Day* and *Coe* was limited by, and subject to, briefing of the *Gunwall* factors. *See* 110 Wn.2d at 471-72.

112 S. Ct. 1846 (1992) (both plurality and dissent would require strict scrutiny for content-based, but viewpoint-neutral speech); *Antioch v. Candidates' Outdoor Graphic Serv.*, 557 F. Supp. 52 (N.D. Cal. 1982) (law banning posting of political signs except for 60 days prior to election violated equal protection clause). It is only because of the applicability of federal law that I concur in the result.

ANDERSEN, C.J., and BRACHTENBACH, J., concur with DURHAM, J.